**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

v.                                                                    Case No.   3:19-cr-72-J-34MCR

LARRY BOUKNIGHT
        a/k/a "Rico"

_____

# O R D E R

**THIS CAUSE** is before the Court on Defendant Larry Bouknight's Motion to Suppress Historically Stored Data (Doc. 25; Motion to Suppress), filed on October 17, 2019.  The government filed a response in opposition to the Motion to Suppress on November 4, 2019.  <u>See</u> United States Response to Larry Bouknight's Motion to Suppress Historically Stored Data (Doc. 31; Response to Motion to Suppress).  The undersigned referred the Motion to Suppress to the Honorable Monte C. Richardson, United States Magistrate Judge, to recommend an appropriate resolution.   On November 13, 2019, the Magistrate Judge heard argument on the Motion to Suppress.[1]  <u>See</u> Transcript of Motion Hearing (Doc. 36; Motion Hr'g Tr.).  Thereafter, on November 27, 2019, the Magistrate Judge entered a Report & Recommendation (Doc. 39; Report) recommending that Defendant's Motion to Suppress be denied.  <u>See</u> Report.   On December 6, 2019, Defendant filed objections to the Report.  <u>See</u> Defendant's Objections to Magistrate Judge's Report and Recommendation to Deny Defendant's Motion to Suppress Historically Stored Data (Doc. 40; Objections).

---

[1] The parties did not present evidence at the motion hearing before the Magistrate Judge.

After reviewing the Objections, the Court directed the government to file a response to the Objections that specifically addressed Defendant's "argument that the search of the historically stored cell phone data for September 1, 2018, through September 7, 2018, exceeded the scope of the warrant, which authorized the release of data only for September 6, 2018—the date of the victim's death." See Order (Doc. 41) at 1.   The Court also directed the government "to advise the Court as to whether a supplemental hearing was necessary to resolve the Motion to Suppress as to that issue." Id.   In response, the government requested "that a hearing be set in this matter at which time the affiant will provide testimony related to the issue before the Court." See United States' Response to Defendant's Objection to Report and Recommendation (Doc. 42; Response to Objections), filed on January 14, 2020.   Thus, on February 5, 2020, the Court held an evidentiary hearing to address the issue of whether the search exceeded the scope of the warrant.   See Minute Entry (Doc. 48); Evidentiary Hearing Transcripts (Doc. 54; Evidentiary Hr'g Tr.).   Accordingly, this matter is ripe for review.

## I.     Standard of Review

The Court reviews a magistrate judge's report and recommendation in accordance with the requirements of Rule 59, Federal Rules of Criminal Procedure (Rule(s)) and 28 U.S.C. § 636(b)(1).   The Court "may accept, reject or modify, in whole or in part, the findings of the recommendations made by the magistrate judge."   28 U.S.C. § 636(b)(1); see also Rule 59(b)(3).   "[I]n determining whether to accept, reject, or modify the magistrate's report and recommendations, the district court has the duty to conduct a careful and complete review."   Williams v. Wainwright, 681 F.2d 732, 732 (11th Cir. 1982

(quoting <u>Nettles v. Wainright</u>, 677 F.2d 404, 408 (5th Cir. Unit B 1982)).[2]   Additionally, pursuant to Rule 59 and § 636(b)(1), where a party timely objects to the magistrate judge's report and recommendation, "[a] judge of the [district] court shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made."   28 U.S.C. § 636(b)(1); <u>see also</u> Rule 59(b)(3); <u>Thomas v. Arn</u>, 474 U.S. 140, 149-50 (1985).   Nevertheless, while de novo review of a magistrate judge's recommendation is required only where an objection is made, the Court always retains the authority to review such a recommendation in the exercise of its discretion.   <u>See</u> Rule 59 advisory committee notes (2005) (citing <u>Thomas</u>, 474 U.S. at 154; <u>Matthews v. Weber</u>, 423 U.S. 261, 270-71 (1976)).

## II.   Background

In the Indictment (Doc. 1), the United States alleges that Haley Bishop died on September 6, 2018, as a result of using a substance containing fentanyl, "a Schedule II controlled substance distributed by the Defendant."   <u>See</u> Indictment at 1.   On September 22, 2018, as part of the investigation into Bishop's death, Sergeant M. Dowling (the Applicant Officer) of the Jacksonville Sheriff's Office (JSO) applied for a state search warrant to obtain cell phone data for the period from September 1, 2018, through

---

[2] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent decisions of the former Fifth Circuit (including Unit A panel discussions of that circuit) handed down prior to October 1, 1981.   <u>W.R. Huff Asset Mgmt. Co., L.L.C. v. Kohlberg, Kravis, Roberts & Co., L.P.</u>, 566 F.3d 979, 985 n.6 (11th Cir. 2009).   After October 1, 1981, "only decisions of the continuing Fifth Circuit's Administrative Unit B are binding on this circuit. . . ."   <u>Dresdner Bank AG v. M/V Olympia Voyager</u>, 446 F.3d 1377, 1381 n. 1 (11th Cir. 2006).   The Court notes that the Fifth Circuit overruled <u>Nettles</u>, in part, on other grounds, in <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1428-29 (5th Cir. 1996) <u>(en banc)</u>. However, "that does not change the binding effect of <u>Nettles</u> in this Circuit because <u>Douglass</u> was decided after October 1, 1981 and was not a Unit B decision."   <u>United States v. Schultz</u>, 565 F.3d 1353, 1360 n.4 (11th Cir. 2009).

September 7, 2018, for phone number (904) 483-0628, which the Applicant Officer believed to be associated with Defendant.   In doing so, the Applicant Officer prepared an affidavit in support of the request for the search warrant and submitted it to a state court judge.   <u>See</u> Affidavit for Search Warrant (Doc. 25-1; Bouknight Affidavit) at 2-4.[3]   In the Bouknight Affidavit, the Applicant Officer states, in relevant part:

> Affiant has reason to believe and does believe that this certain Target Telephone located in Duval County Florida described as follows to-wit:
>
> **The Historically Stored Data for (904) 483-0628 to obtain incoming/outgoing call records, incoming/outgoing text messages, and historical cell site data within the automated files of the common telephone carrier (T-Mobile) for the dates of September 1, 2018 to September 7, 2018.**
>
> Herein after referred to as the "Target data" was the product of the use of Larry Bouknight II for the purpose of violating the laws of Florida, relating to felony crime(s), to wit, Homicide and Possession of a Controlled Substance (Heroin/Fentanyl), in violation of Chapter 782.04 & 893.13, Florida Statutes[.]
>
> . . .
>
> **<u>Probable Cause:</u>**
>
> Below are details of a homicide narcotic related death that occurred at 3534 Smithfield Street #1506, Jacksonville, Duval County, Florida 32217.   The incident occurred as follows:
>
> On September 6, 2018, the victim was found unresponsive in her apartment located at 3534 Smithfield Street #1506, Jacksonville, Florida 32217.   The victim was transported to Memorial Hospital where she was pronounced deceased at 1806 hours.   Upon identifying the victim as Haley Bishop, it was learned that Bishop had bought and used heroin earlier in the day at 1762 Sheridan St.

---

[3] When he completed the Bouknight Affidavit, the Applicant Officer was a detective in the homeland security narcotics division of JSO.   <u>See</u> Evidentiary Hr'g Tr. at 8.   He became a sergeant in April 2019.   <u>Id.</u>

> The investigation revealed that Bishop met an unknown male, later identified as Larry Bouknight II, at the store located at 1762 Sheridan St. and purchased $40 worth of heroin on September 6, 2018.   Kristen Graham arranged the drug transaction for Bishop with Bouknight via cell phone and was with Bishop when she purchased the drugs from Bouknight on the day of her death.   Graham showed your affiant text messages arranging the drug transaction with the defendant. There were no apparent signs of foul play but Bishop is a known narcotic abuser.   Bishop's body was turned over to the Duval County Medical Examiner Office to determine [the] cause of [her] death.
>
> **Investigative Need for Court Approval:**
>
> Your Affiant believes that the forensic search of the Target Telephone automated records will aide [sic] law enforcement in identifying if Bouknight met with Graham and Bishop and sold Bishop drugs that could have taken her life.   Additionally, the search of Graham's [sic] toll and cell site data could put Bouknight, Graham, and Bishop together just hours before Bishop's death.   That would lead to possible charges being brought against Bouknight.

Id. at 2-3 (bold in original).

Based upon the Bouknight Affidavit, the judge found probable cause to issue the requested search warrant, which she signed and issued that same day.   See Search Warrant (Doc. 25-1; Bouknight Warrant) at 1.   The Bouknight Warrant provides in relevant part:

> WHEREAS, complaint on oath and in writing, supported by affidavit, having been made this day before the undersigned Judge of the Fourth Judicial Circuit, in and for Duval County, Florida;
>
> AND WHEREAS, said facts made known to me have caused me to certify and find that there is a probable cause to believe that historically stored incoming and outgoing calls, and historical cell site data is being kept within the files of the common telephone carrier(s) described as follows:
>
> **The Historically Stored data for (904) 483-0628 to obtain incoming/outgoing call records,**

> **incoming/outgoing text messages, and historical cell site data within the automated files of the common telephone carrier (T-Mobile) for the dates of September 1, 2018 to September 7, 2018.**
>
> Herein after referred to as the "Historically Stored Data["] within the files of (T-Mobile).  The stored data believed to be the product of telephonic usage of Larry Bouknight II known for the purpose of violating the laws of Florida, and concealing the evidence relating to felony crime(s), to wit, Possession of a Controlled Substance (Heroin/Fentanyl) [in violation] of Chapter 893.13, Florida Statutes;
>
> AND WHEREAS the facts establishing the grounds for this application are set forth in the affidavit of **Sergeant J.M. Dowling** of the Jacksonville Sheriff's Office- Narcotics Division;
>
> NOW THEREFORE, T-Mobile is ordered to release [t]he Historically Stored Data for **(904) 483-0628** to obtain incoming/outgoing call records, incoming/outgoing text messages, and historical cell site data within the automated files of the common telephone carrier (T-Mobile) for September 6, 2018.

Id. (bold in original; underlining added).  With the Bouknight Warrant in hand, law enforcement requested data for telephone number (904) 483-0628 from September 1, 2018, through September 7, 2018, and T-Mobile produced that data.  See Evidentiary Hr'g Tr. at 19; Minute Entry, Defendant's Supplemental Exhibit 1: JSO Preservation of Records Form (Doc. 48-3; Preservation Request); Records Custodian Certification (Doc. 25-2); CD containing excel spreadsheet (Doc. 25-3); Interpretation of Records (Doc. 25-4).

In his Motion to Suppress, Defendant argues that the Bouknight Affidavit failed to establish probable cause to support the issuance of the Bouknight Warrant.  See generally Motion to Suppress.  Specifically, Defendant asserts that the Bouknight Affidavit was deficient for the following reasons:

a. [The Bouknight Affidavit failed] to explain how phone number (904) 483-0628 is associated with Mr. Bouknight, or how he connected that phone number to Mr. Bouknight between September 1, 2018 and September 7, 2018.

b. [The Bouknight Affidavit] failed to explain the phone numbers used for the text messages arranging the alleged drug transaction.  It fails to provide any details regarding the text messages, only making conclusory statements that the text messages were indicative of a drug transaction.

c. Under "Investigative Need for Court Approval," the affidavit discusses "the forensic search of the Target Telephone automated records . . . ."  First, "Target Telephone" is never defined in the affidavit.  Second, the language clearly indicates an intent to conduct a forensic search of an actual phone (hardware) vice obtain records from a common carrier.

d. Also under "Investigative Need for Court Approval," the affidavit indicates that he is seeking a "search of Graham's toll and cell site data . . . ."  But previously in the affidavit, the officer states the data "was the product of the use of Larry Bouknight II . . . ."

Motion to Suppress at 4-5.  Defendant argues that because of these "substantial shortcomings and inconsistencies in the affidavit, there was no substantial basis for the issuing judge to conclude that probable cause existed under the totality of the circumstances to issue a warrant for the Historically Stored Data for phone number (904) 483-0628."  Id. at 5.

Defendant also maintains that "the search warrant itself is defective."  Id.  In doing so, Defendant argues that although the Bouknight Affidavit specifically sought data from September 1, 2018, through September 7, 2018, the Bouknight Warrant authorized only "the seizure of the Historically Stored Data for September 6, 2018 in its final line of text." Id.  Because of this defect, Defendant asserts that the Bouknight Warrant "is so facially defective that the executing officer could not reasonably presume it to be valid."  Id. at 7.

Notably, Defendant articulated this argument in a different way at the motion hearing before the Magistrate Judge, where Defendant stated that because the Bouknight Warrant directed T-Mobile to release data from only September 6, 2018, the search, which included data from September 1st through September 7th, "exceeded the warrant and therefore was unreasonable under the Fourth Amendment and should be suppressed." See Motion Hr'g Tr. at 18; 24-30.

In the Report, the Magistrate Judge opines that the Motion to Suppress should be denied. See generally Report. Specifically, the Magistrate Judge recommends that, "based on the totality of the circumstances, the information provided by Graham could be used to support the probable cause determination." Id. at 17. Regarding Defendant's argument that the Bouknight Affidavit failed to connect him to telephone number (904) 483-0628, the Magistrate Judge concludes that "the affidavit adequately defines the 'Target Telephone' as telephone number (904) 483-0628, which was connected to Defendant (and his use of the phone during the relevant period) through information provided by Graham and the text messages she shared with the investigators through which she arranged the drug transaction with Defendant." Id. at 15. In addition, the Magistrate Judge recommends that "the affidavit is sufficiently clear that it sought the historically stored data for the phone from the mobile carrier rather than a physical search of the device." Id. at 17. The Magistrate Judge also concludes that the Bouknight Affidavit's reference to "Graham's" data (rather than Defendant's data) "was likely an oversight," as "the affidavit was clear that 'the 'Target data' was the product of the use of Larry Bouknight II.'" Id. (quoting Bouknight Affidavit at 2). Finally, as to Defendant's argument that the search

exceeded the scope of the Bouknight Warrant, the Magistrate Judge recommends as follows:

> [T]he only reference to September 6, 2018 (the date of the victim's death) in the ordered paragraph of the warrant is apparently an oversight by the issuing state judge because both the warrant and the affidavit clearly state that the historically stored data should be provided for the period September 1, 2018 to September 7, 2018. As the bolded paragraphs in both the warrant and the affidavit provide that the relevant period for the data is September 1, 2018 to September 7, 2018, the Court is not convinced that the search exceeded the scope of the warrant.

Id. at 18.[4]

In his Objections to the Report, Defendant largely reiterates the arguments raised in the Motion to Suppress—that the information in the Bouknight Affidavit was insufficient to establish probable cause for the Bouknight Warrant and that the scope of the search exceeded the Bouknight Warrant.   The Court will address each issue in turn, starting with probable cause.

## III.   Discussion

### A.   Probable Cause

The Fourth Amendment mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."[5]   U.S. Const. amend. IV.   "Probable cause to

---

[4] The Magistrate Judge also recommends that Defendant is not entitled to an evidentiary hearing under Franks v. Delaware, 438 U.S. 154 (1978).   See Report at 14-15.   Notably, Defendant clarified at the motion hearing before the Magistrate Judge that he was not attempting to challenge the veracity of the Bouknight Affidavit under Franks.   See Motion Hr'g Tr. at 11. Thus, the Court need not address this issue further or adopt the recommendation regarding its resolution.

[5] In Carpenter v. United States, 138 S. Ct. 2206, 2221 (2018), the Supreme Court held that "[t]he Government's acquisition of [ ] cell-site records was a search within the meaning of the Fourth Amendment," id. at 2220, and that "the Government must generally obtain a warrant supported by probable cause before acquiring such records," id. at 2221.

support a search warrant exists when the totality of the circumstances allows the conclusion that 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"   United States v. Kapordelis, 569 F.3d 1291, 1310 (11th Cir. 2009) (quoting Illinois v Gates, 462 U.S. 213, 238 (1983)), cert. denied, 130 S. Ct. 1315 (2010).   The Supreme Court has instructed that "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."   Gates, 462 U.S. at 232.

When determining whether a search warrant was supported by probable cause, the reviewing court's inquiry is limited to whether the issuing judge "had a substantial basis for . . . conclude[ing] that probable cause existed."   See id. at 238-39 (internal citation and quotation marks omitted) (alteration in original).   In making this inquiry, the reviewing court "must consider only that information brought to the attention of the issuing judge."   See United States v. Schulz, 486 F. App'x 838, 842 (11th Cir. 2012) (citing United States v. Lockett, 674 F.2d 843, 845 (11th Cir. 1982)).   Importantly, "[c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote a high level of deference traditionally given to [judges] in their probable cause determinations.'"   United States v. Hatcher, 300 F. App'x 659, 663 (11th Cir. 2008) (quoting United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994)).   Indeed, the issuing judge's "determination of probable cause should be paid great deference by reviewing courts."   Gates, 462 U.S. at 236 (internal quotation marks and citation omitted); see also United States v. Nixon, 918 F.2d 895, 900 (11th Cir. 1990) ("We have also said that the practical nature of the magistrate[ ]

[judge's] decision justifies 'great deference' upon review and calls for upholding the magistrate[ ] [judge's] findings even in marginal or doubtful cases.").

Upon independent review of the Bouknight Affidavit and Warrant, the undersigned finds that the state court judge had a substantial basis to conclude that probable cause existed to issue the Bouknight Warrant.   In the Bouknight Affidavit, the Applicant Officer averred that, through his investigation of Bishop's death, he learned that Bishop purchased drugs on the day of her death and that she was a known drug-abuser.   See Bouknight Affidavit at 3.   In addition, the Applicant Officer stated that a cooperating individual (Graham) showed him text messages that she (Graham) sent to Defendant to arrange a drug transaction between Bishop and Defendant on the day Bishop died.[6]   Id.   Graham also told the Applicant Officer that she was with Bishop when Bishop purchased the drugs from Defendant.   Id.   Based on these text messages, the Applicant Officer believed that a search of Defendant's telephone records and its cell-site location data would show that Defendant arranged to sell drugs to and was with Graham, and therefore with Bishop, hours before Bishop died.   Id.   This information was sufficient to establish a "fair probability" that evidence of a crime would be found in cell phone data associated with phone number (904) 483-0628.[7]

---

[6] In the Motion to Suppress, Defendant argues that the Bouknight Affidavit failed to establish probable cause because it did not "provide any details regarding the messages" between Graham and Defendant, "only making conclusory statements that the text messages were indicative of a drug transaction."   See Motion to Suppress at 4-5.   The Court finds this argument unavailing.   The Applicant Officer averred that he saw "Graham's text messages arranging the drug transaction with the defendant."   See Bouknight Affidavit at 3.   The Applicant Officer also stated that he had been employed with JSO for over five years and had received "specialized narcotics training."   Id. at 2.   Thus, it was reasonable for the state court judge to rely on the Applicant Officer's characterization of the text messages.

[7] In his Objections, Defendant argues that the Magistrate Judge improperly makes "inference upon inference" to conclude that the Bouknight Affidavit provided sufficient information for a probable cause determination.   See Objections at 3.   In particular, Defendant contends that the Magistrate Judge improperly infers that Graham knew Defendant "from previous dealings

In his Objections to the Report, Defendant argues that the Bouknight Affidavit lacked sufficient information to establish probable cause because, among other things, it failed to connect him to phone number (904) 483-0628. <u>See</u> Objections at 3-4. The Court is not persuaded by this argument. The Bouknight Warrant directed T-Mobile to release data for a particular phone number, not a particular person, and the information in the Bouknight Affidavit sufficiently connected that phone number to a drug transaction with Bishop on the day she died—a drug transaction set up by Graham using that cell number and then witnessed by Graham to have occurred with Bouknight as the distributor of the drugs. As such, the Court finds that the Applicant Officer's failure to explain exactly how he learned that Defendant was the individual associated with phone number (904) 483-0628 from September 1, 2018, through September 7, 2018, was not pertinent to the state court judge's probable cause determination. To the extent that Defendant is suggesting the government has not adequality proven the connection between Defendant and the particular phone number, the Court finds that to be an issue for trial, not an issue that would undermine a finding that there was probable cause to believe that a search of the records and cell-site data associated with that phone number would lead to evidence of the crime being investigated.

---

because she contacted him on his cellular phone," <u>see</u> Report at 16, and that "Graham was capable of confirming Defendant's identity based on her prior personal interaction(s) with him," <u>id.</u> at 16 n. 8. Defendant argues that these inferences were improper because the Bouknight Affidavit does not refer to prior personal interactions between Defendant and Graham or indicate "that Graham confirmed Mr. Bouknight's identity as the individual who sold the drugs[.]" <u>See</u> Objections at 3. Because the undersigned concludes that the Bouknight Affidavit contains sufficient information to support a probable cause determination regardless of whether Graham identified Defendant by name or whether Graham had previous dealings with Defendant, the Court need not adopt this portion of the Magistrate Judge's discussion.

Defendant also argues that the Bouknight Affidavit was "plagued by so many inconsistencies and errors that the issuing judge must have acted arbitrarily in granting the search warrant."   Id. at 5; see also Motion to Suppress at 5.   In support of this argument, Defendant notes that the Applicant Officer incorrectly referred to "Graham's" data rather than Defendant's data in the last paragraph of the Bouknight Affidavit.   See id. Defendant also asserts that the language "forensic search of the Target Telephone automated records," see Bouknight Affidavit at 3, indicated an intent to search the phone's hardware rather than the cell-site data.   See Motion to Suppress at 5.   However, a common sense reading of the Bouknight Affidavit shows that the Applicant Officer sought the data associated with phone number (904) 483-0628, particularly the cell-site location data as well as the record of incoming and outgoing calls and text messages, not a physical search of the actual phone.   As such, it would have been reasonable for the issuing judge to understand that the Bouknight Affidavit's reference to a "forensic search" was a reference to a search of/for data associated with the phone number identified.   It is also readily apparent from the Bouknight Affidavit that the Applicant Officer believed that phone number (904) 483-0628 was associated with Defendant, not Graham, and therefore the reference to "Graham's" toll and cell site data in the last paragraph of the Bouknight Affidavit was an inconsequential error.   See Bouknight Affidavit at 3.   Thus, the Court finds that any such inconsistency in the Bouknight Affidavit would not have interfered with or undermined the issuing judge's probable cause determination.[8]   See generally United States v. Glinton, 154 F.3d 1245, 1256 (11th Cir. 1998) ("As has often been stated, minor discrepancies in an affidavit should not subvert an officer's good-faith revelations of facts

_____

[8] Defendant does not suggest that the errors were intentional.

establishing probable cause." (citing <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 184-85 (1990);

<u>Maryland v. Garrison</u>, 480 U.S. 79, 88 (1987))).   In sum, the Court finds that the Bouknight

Affidavit provided probable cause for the issuance of the Bouknight Warrant.

**B.   Scope of the Search[9]**

Next, the Court turns to Defendant's argument that because the last paragraph of

the Bouknight Warrant directed T-Mobile to release data only for September 6, 2018, the

search, which resulted in the disclosure of data from September 1st through September

7th, exceeded the scope authorized by the Bouknight Warrant.   At the supplemental

evidentiary hearing before the undersigned, the Applicant Officer testified that he prepared

both the Bouknight Affidavit and Warrant, <u>see</u> Evidentiary Hr'g Tr. at 11, 16, the issuing

judge did not make any changes to the Bouknight Warrant before signing it, <u>id.</u> at 34, and

the Applicant Officer did not read the Bouknight Warrant after the judge signed it, <u>id.</u> at 35.

The Applicant Officer testified that after the judge signed the Bouknight Warrant, he

electronically delivered it to T-Mobile with a preservation of records form.   <u>See id.</u> at 35-

36, 38; Preservation Request at 1.   The Preservation Request asked T-Mobile to preserve

certain records relating to phone number (904) 483-0628 "during the time period

09/01/2018-09/07/2018[.]"   <u>Id.</u>   The Applicant Officer testified that in drafting the

Bouknight Affidavit and Warrant, he "intended to receive the data for September 1st

through September 7th to use in [his] investigation."   <u>Id.</u> at 14.   When asked why he typed

September 6th in the last paragraph of the Bouknight Warrant, the Applicant Officer

testified that September 6th was a significant date "in [his] head" because that was the

---

[9] Because the Magistrate Judge did not have the benefit of the Applicant Officer's testimony, the Court will address the parties' arguments regarding the scope of the Bouknight Warrant anew.   Accordingly, the Court declines to adopt the portion of the Report pertaining to Defendant's arguments that the search exceeded the scope authorized by the Bouknight Warrant.

date on which Bishop died, and he "entered that [date] into the [Bouknight Warrant] in an error."   Id.   In addition, the Applicant Officer testified that when he sought to obtain the Bouknight Warrant for the cell data associated with what he believed to be Defendant's cell phone number, he also sought to obtain a search warrant for the data associated with Graham's cell phone number.   See id. at 10-11; Government's Supplemental Exhibit 2 (Doc. 48-2; Graham Affidavit and Warrant).   The Graham Warrant, signed by the same judge on September 22, 2018, ordered Metro PCS to release data from September 1, 2018, through September 7, 2018.   See Evidentiary Hr'g Tr. at 17-19.   The Applicant Officer testified that he specifically sought data for both phones from September 1st through September 7th, because he "wanted to show that there was no communication and [Defendant and Graham] were not together prior to September 6th, and they were in fact communicating throughout the day on September 6th and were in the same location at a certain point in the day on September 6th."   Id. at 10-12, 15, 18-19.

Having presented the Applicant Officer's testimony, the government argued that even though the last paragraph of the Bouknight Warrant directed T-Mobile to produce records only for September 6th, the ultimate search, which included data from September 1st through September 7th, did not exceed the scope of the Bouknight Warrant.   In support of this argument, the government asserted that the Applicant Officer had sufficiently articulated a request for data from September 1st through September 7th elsewhere in the Bouknight Affidavit and Warrant.   See Evidentiary Hr'g Tr. at 39-40.   In particular, the government noted that the Applicant Officer defined "Historically Stored Data" in the Bouknight Warrant to include data from September 1st through September 7th, and that defined term was included in the decretal portion of the Bouknight Warrant,

in which the Court ordered T-Mobile "to release [t]he Historically Stored Data for (904) 483-0628 . . . for September 6, 2018."[10]   See Evidentiary Hr'g Tr. at 13-14.   The government maintained that the Applicant Officer's testimony established that his reference to September 6th in the last paragraph of the Bouknight Warrant was simply a mistake that should not limit its scope.

Upon consideration, the Court is not persuaded by the government's arguments. Despite the Applicant Officer's conflicting use of the term "Historically Stored Data," the Bouknight Warrant ultimately directed T-Mobile to produce data only for September 6th, 2018.   As such, the Court determines that the Applicant Officer exceeded the scope of the search authorized by the Bouknight Warrant by requesting and obtaining data from September 1st through 5th and September 7th.   In reaching this conclusion, the Court is persuaded by the analysis of the district court in United States v. Robinson, 358 F. Supp. 2d 975 (D. Mont. 2005).   There, a law enforcement officer prepared a search warrant affidavit in support of a warrant authorizing the search of the defendant's residence and vehicle for contraband.   See id. at 976.   Although the accompanying warrant, also drafted by the Applicant Officer, contained a probable cause determination that "evidence of drug trafficking crimes exist[ed] 'in the residence and vehicle more particularly described above,'" the decretal portion of the warrant did not include a reference to the residence and authorized a search of the vehicle only.   Id. at 976-77.   Nevertheless, law enforcement officers ultimately searched the defendant's residence and vehicle.   The district court suppressed the evidence seized from the residence, finding that the search exceeded the scope of the warrant.   In doing so, the court stated that

_____

[10] In the Bouknight Affidavit, the Applicant Officer used the same description to define the term "Target data."   See Bouknight Affidavit at 2.

given the Constitution's requirement that law enforcement officers executing a search warrant remain within the strict bounds of the warrant, the Court must refrain from relying on the approving judge's apparent intent to expand the scope of the warrant.   The government is correct that in certain instances mistakes in warrants can be overlooked by a reviewing Court.   Such cases typically involve minor errors in the description of the place to be searched or the items to be seized.   In those cases, there is no doubt about the intent of the judge issuing the warrant.   In this case, in which there is not a mistaken description but a complete omission, some doubt remains as to the intent of the issuing judge.   There is no authority empowering a reviewing court to find through divination that the issuing judge meant to authorize the search of a residence where the warrant on its face fails to authorize such a search.   The failure to command a search of the residence was almost certainly a mistake, but not one for this Court to correct.

Id. at 977.   Similar to the warrant in Robinson, although the Bouknight Warrant includes a probable cause finding for the "Historically Stored Data" defined as the data from September 1st through September 7th, the Bouknight Warrant ultimately directed T-Mobile to release data only for September 6th, the date of the drug transaction and Bishop's death.   In order to conclude that the search in this case did not exceed the scope of the Bouknight Warrant, the Court would have to assume that the issuing judge intended to authorize the release of all data sought in the Bouknight Affidavit and that she failed to notice that the Bouknight Warrant authorized data for September 6th only.   Certainly that is possible.   However, it is also possible that the judge did read the Bouknight Warrant and determined that the search should be limited to September 6th – the date of the victim's death.[11]   Without hearing from the issuing judge, the Court has no basis to

---

[11] In support of its argument that "[t]he Court should consider [the date] discrepancy to be a scriveners error that does not render the warrant invalid," the government cites to United States v. Snyder, 471 F. App'x 884, 885-86 (11th Cir. 2012).   See Response to Objections at 2-3.   However, the Court finds Snyder to be readily distinguishable from the instant case.   In Snyder, a law enforcement officer completed an affidavit in support of a search warrant for Snyder's

conclude that she meant something other than what the warrant she signed actually stated.[12]   Thus, by seeking and obtaining historical data from September 1st through 5th and the 7th, law enforcement exceeded the scope of the search authorized by the Bouknight Warrant.

Having concluded that the search exceeded the scope authorized by the Bouknight Warrant, the Court must now address Defendant's contention that the exclusionary rule requires suppression of the evidence obtained by law enforcement.   Although the Fourth

_____

residence.   The affidavit stated that a confidential informant "had observed personally a black male known as 'Black' in possession of drugs packaged for sale at Black's home at '1942 Queen City Avenue.'   The affidavit then contained detailed directions to '1924 Queen City Avenue,' describing the residence as a white two-story house with black trim and with the numbers '1924' on the right side of the front door.   Based on [the] affidavit, a search warrant issued authorizing a search of 1924 Queen City Avenue," which was Snyder's residence.   Id. at 885.   In affirming the district court's "determination that the affidavit's singular reference to '1942 Queen City Avenue' was a typographical error," the Eleventh Circuit held that "[a]lthough the affidavit mentioned '1942 Queen City Avenue' once, it provided detailed directions to 1924 Queen City Avenue and provided a clear description of that house, including that it had the number '1924' by the front door."   Id.   The government's reliance on Snyder is unavailing.   Preliminarily, the Court observes that the error in Snyder was in the initial description of the residence in the affidavit, not in the description of the premises to be searched set forth in the warrant.   Thus, the search conducted was authorized by the warrant.   Despite the transposed number in the first identification of the address, the remainder of the affidavit and warrant clearly identified the premises to be searched and that was the premises law enforcement actually searched.   Such is not the case here.   Additionally, even assuming the reference to September 6th was a mistake on the Applicant Officer's part in preparing the proposed warrant, that does not necessarily mean that Judge Senterfitt intended to authorize the release of all data from September 1st through September 7th, when she signed a warrant authorizing only the release of data for September 6th.

[12] The Court has considered whether the judge's issuance of the Graham Warrant, in which she authorized the release of Graham's cell data for September 1st through September 7th, on the same day as she issued the Bouknight Warrant shows that she actually intended to authorize the release of Defendant's cell data for the same period.   Ultimately, however, the Court concludes that the Graham Warrant does not conclusively establish the judge's intent with regard to the Bouknight Warrant.   Indeed, it is equally possible that the judge intended to limit both searches to September 6th but overlooked the reference to the extended date range in the Graham Warrant rather than the date in the Bouknight Warrant.   Afterall, it would not be unreasonable for the judge to narrow the search to include data only for the date of the drug transaction and the victim's death.   It is also possible that the issuing judge found it reasonable for law enforcement to obtain a broader period of data for Graham, who was cooperating, but limited the data regarding Defendant to the day of the alleged crime.   If the issuing judge intended something other than what is written in the warrant that she signed, on this record, the Court cannot divine what it was that she intended.

Amendment protects "against unreasonable searches and seizers," see U.S. Const. amend. IV, it "contains no provision expressly precluding the use of evidence obtained in violation of its commands . . . ." United States v. Leon, 468 U.S. 897, 906 (1984). Instead, the judicially created exclusionary rule, "when applicable, forbids the use of improperly obtained evidence at trial." Herring v. United States, 555 U.S. 135, 139 (2009). "[T]he rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures: 'The rule is calculated to prevent, not to repair.   Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.'" United States v. Calandra, 414 U.S. 338, 347 (1974) (quoting Elkins v United States, 364 U.S. 206, 217 (1960)).   Significantly, "[t]he fact that a Fourth Amendment violation occurred—i.e., that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." Herring v. United States, 555 U.S. 135, 140 (2009) (Herring II) (citing Illinois v. Gates, 462 U.S. 213, 223 (1983)).   See also Leon, 468 U.S. at 906 ("Whether the exclusionary sanction is appropriately imposed in a particular case, . . . is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct."   (internal quotation marks and citations omitted)).   Instead, "three conditions [ ] must occur to warrant application of the exclusionary rule.   First, there must be misconduct by the police or by adjuncts to the law enforcement team.   Second, application of the rule must result in appreciable deterrence of that misconduct.   Finally, the benefits of the rule's application must not outweigh its costs." United States v. Herring, 492 F.3d 1212, 1217 (11th Cir. 2007) (Herring I) (citing Leon, 468 U.S. at 909-17).   Notably, "[t]he pertinent analysis of

Case 3:19-cr-00072-MMH-MCR   Document 59   Filed 06/15/20   Page 20 of 25 PageID 272

deterrence and culpability is objective, not an inquiry into the subjective awareness of [the] officers[.]"  Herring II, 555 U.S. at 145 (internal quotation marks and citations omitted).

Applying the principles set forth above, the Court finds that application of the exclusionary rule is warranted in this case.   Regarding the first condition, that there must be misconduct by the police or by adjuncts to the law enforcement team, the conduct at issue here is the failure to read the Bouknight Warrant after the issuing judge signed it. There is no dispute that this failure is attributable to a police officer, as opposed to a judicial officer.   Although there is nothing in the record to suggest that the Applicant Officer's failure to read the Bouknight Warrant before sending it to T-Mobile was intentional misconduct, the Court finds that it was at least reckless.   Notably, if the Applicant Officer had read the Bouknight Warrant again after receiving it from the judge, he would have realized his apparent drafting mistake, and he could have presented it to the issuing judge to determine whether she actually intended to limit the search to September 6th as stated in the Bouknight Warrant.   What the government seems to suggest is that the failure to read the warrant was of no consequence because having drafted the Bouknight Affidavit and Warrant, as well as the Graham Affidavit and Warrant, the Applicant Officer knew what data he intended to obtain.   But what matters is not what the officer sought to obtain or even what he intended to obtain, but rather what matters is what the judicial officer authorized him to obtain.   If the Applicant Officer had testified that he read the Bouknight Warrant, noticed that it was limited to September 6th, but decided to proceed to collect data for the entire period of September 1st through September 7th because that was what he sought in the Bouknight Affidavit, the government would have been hard pressed to find a basis to defend a knowing disregard of the actual language of the Bouknight

Case 3:19-cr-00072-MMH-MCR   Document 59   Filed 06/15/20   Page 20 of 25 PageID 272

deterrence and culpability is objective, not an inquiry into the subjective awareness of [the] officers[.]"  Herring II, 555 U.S. at 145 (internal quotation marks and citations omitted).

Applying the principles set forth above, the Court finds that application of the exclusionary rule is warranted in this case.   Regarding the first condition, that there must be misconduct by the police or by adjuncts to the law enforcement team, the conduct at issue here is the failure to read the Bouknight Warrant after the issuing judge signed it. There is no dispute that this failure is attributable to a police officer, as opposed to a judicial officer.   Although there is nothing in the record to suggest that the Applicant Officer's failure to read the Bouknight Warrant before sending it to T-Mobile was intentional misconduct, the Court finds that it was at least reckless.   Notably, if the Applicant Officer had read the Bouknight Warrant again after receiving it from the judge, he would have realized his apparent drafting mistake, and he could have presented it to the issuing judge to determine whether she actually intended to limit the search to September 6th as stated in the Bouknight Warrant.   What the government seems to suggest is that the failure to read the warrant was of no consequence because having drafted the Bouknight Affidavit and Warrant, as well as the Graham Affidavit and Warrant, the Applicant Officer knew what data he intended to obtain.   But what matters is not what the officer sought to obtain or even what he intended to obtain, but rather what matters is what the judicial officer authorized him to obtain.   If the Applicant Officer had testified that he read the Bouknight Warrant, noticed that it was limited to September 6th, but decided to proceed to collect data for the entire period of September 1st through September 7th because that was what he sought in the Bouknight Affidavit, the government would have been hard pressed to find a basis to defend a knowing disregard of the actual language of the Bouknight

- 20 -

Warrant.   It can fare no better, by relying on a failure to read the Bouknight Warrant at all. Thus, the Court finds that the first condition is present in this case.

Turning to the second condition, the Court finds that application of the exclusionary rule in this case likely would result in appreciable deterrence of future, similar misconduct. The Court is cognizant of the Eleventh Circuit's caution in <u>Herring I</u> that "[d]eterrents work best where the targeted conduct results from conscious decision making, because only if the decision maker considers the possible results of [his] actions can [he] be deterred." <u>See</u> <u>Herring I</u>, 492 F.3d at 1218.   However, the Court finds the behavior to be deterred in this case is easily distinguishable from that at issue in <u>Herring I</u> where the Eleventh Circuit held that exclusion of evidence resulting from negligent record keeping was unlikely to reduce any future negligence, because, among other things, the negligent conduct was committed by officers of a different department in another county.   <u>See</u> <u>id.</u>   Here, the failure, while likely not actively intentional, was entirely and conspicuously within the control of the Applicant Officer.   The Court is of the view that exclusion of the data not explicitly authorized by the Bouknight Warrant under these circumstances will significantly deter the Applicant Officer and others from failing to read a warrant before executing it.

As for the third condition, the Court determines that the deterrence resulting from the application of the exclusionary rule in this case will outweigh the cost of excluding the data not authorized by the warrant—data from September 1st through 5th and the 7th.   In this regard the Court notes that the government stated at the supplemental evidentiary hearing that it did not intend to use data from September 1st through 5th or the 7th at trial. <u>See</u> Evidentiary Hr'g Tr. at 4-5, 36-37.   In response to the Court's inquiries about its plans for the evidence, the government represented as follows:

THE COURT:        Ms. Hackenberry [counsel for the government], does the United States intend to use in any way or reference in any way any data obtained from . . . September 1st through the 5th, whether it's to say there had been no communication or anything like that . . . in the trial of this case?

MS. HACKENBERRY:        No, Your Honor.    The relevant date will be the September 6th date.

THE COURT:        And   did   the   absence   of communications or the absence of the two phones being in proximity of one another play any role in the investigation?

MS. HACKENBERRY:        Not - - really.   I mean, it was the September 6th date that was of importance to us, that those phones were in the vicinity of one another, which corroborated what the cooperating individual, . . . the other phone's user told us.

. . .

THE COURT:        Going back to where we started at the beginning of the hearing, Ms. Hackenberry, you got up and . . . questioned whether we needed to proceed with the evidentiary presentation because the Government was only using - - intended to rely on the September 6th data.

Now, Mr. Korody [defense counsel] disagreed with that because his argument based on <u>Sotto</u> is this flagrant disregard argument.

But setting that aside, by saying that, were you suggesting that the Court didn't need to hear evidence because the Court could simply suppress the September 1 through September 5, and September 7th [data], and that would be the end of the issue?

MS. HACKENBERRY:        Potentially, Your Honor.   I mean, if that's - - if that's what - - I don't think that would be the right thing to do.   I don't think that's   - - I think we've argued for why that shouldn't be done.   But the September 6th date is the most relevant date to us.

So, I mean if that were to happen, I don't - - I mean, I guess that would - - I mean, the Government would be able to go proceed without case and put on our evidence, but I don't - - I don't think that legally is the right thing to do given all the reasons that we've already argued.

Id. at 36-37, 43-44.   Thus, it appears that data from September 1st through 5th and the 7th is not essential to the government's case.   Accordingly, the Court finds that the deterrent value achieved here by applying the exclusionary rule outweighs the low social cost of exclusion.   Because all of the conditions identified by the Eleventh Circuit in Herring I are present in this case, the Court finds that exclusion of data not explicitly authorized by the Bouknight Warrant is appropriate in this case.[13]

The Court turns next to Defendant's argument that suppression of data from September 6th is also warranted because law enforcement flagrantly disregarded the scope of the Bouknight Warrant.   In general, when a search exceeds the scope of a warrant, "[o]nly the evidence seized while police are acting outside of the boundaries of the warrant is subject to suppression."   United States v. Hendrixson, 234 F.3d 494, 497 (11th Cir. 2000).   Total suppression, including of evidence properly seized, "may be appropriate if the executing officers' conduct exceeds any reasonable interpretation of the warrant's provisions."   United States v. Wuagneux, 683 F.2d 1343, 1354 (11th Cir. 1982) (citations omitted).   However, "[a]bsent a flagrant disregard of the terms of a warrant, seizure of items outside the scope of the warrant does not affect admissibility of items properly seized . . . ."   United States v. Lambert, 887 F.2d 1568, 1572 (11th Cir. 1989) (citations omitted).   Here, the Court finds that Defendant has made no showing to justify suppression of data from September 6th.   Indeed, the Bouknight Warrant specifically ordered T-Mobile to release data from September 6th.   Moreover, although the Applicant Officer erred in failing to read the Bouknight Warrant after the judge signed it, nothing in the record suggests that he did so with a deliberate intention to disregard the intended

---

[13] The government concedes that the good faith exception would not be applicable in this case.   See Response to Motion to Suppress at 6-7.

scope of the Bouknight Warrant.   Rather, his failure to read the Bouknight Warrant again after the judge signed it is consistent with his testimony that when he drafted the Bouknight Warrant, he believed that he had requested data from September 1st through September 7th.   Because the judge did not make any changes to the Bouknight Warrant, it appears that the Applicant Officer simply thought he was authorized to obtain all data from September 1st through September 7th.   Thus, the Applicant Officer did not flagrantly disregard the Bouknight Warrant by failing to read the Bouknight Warrant again after the judge signed it, as he believed, albeit mistakenly, that he already knew what the Bouknight Warrant said.   As such, Defendant's request for a blanket suppression of all the data obtained from T-Mobile, including data from September 6th, based on the Applicant Officer's alleged fragrant disregard of the Bouknight Warrant is due to be denied.[14]

Accordingly, it is

**ORDERED:**

1.      Defendant's Objections to Magistrate Judge's Report and Recommendation to Deny Defendant's Motion to Suppress Historically Stored Data (Doc. 40) are **OVERRULED in part** and **SUSTAINED in part** only as stated herein.

---

[14] The Court also notes that the inevitable discovery doctrine would apply to incoming and outgoing calls and text messages from September 6th.   Under the doctrine of inevitable discovery, notwithstanding an illegal search, "if the prosecution can establish by a preponderance of the evidence that the information would have ultimately been recovered by lawful means, the evidence will be admissible."   United States v. Virden, 488 F.3d 1317, 1322 (11th Cir. 2007) (citing Nix v. Williams, 467 U.S. 431, 434 (1984)).   For the doctrine to apply, the prosecution must also show that "the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct."   Id. (quotation marks and citation omitted) (emphasis in original).   Here, the Applicant Officer obtained a warrant for Graham's cell phone data the same day he obtained the Bouknight Warrant for Defendant's data.   See Evidentiary Hr'g Tr. at 17-19. The Graham Warrant inevitably would have led the Applicant Officer to discover any calls or texts messages between Defendant and Graham on September 6, 2018.   As the Applicant Officer testified at the evidentiary hearing, if he had only received data for September 6th for Graham's phone number, he still would have been able to determine whether Defendant and Graham communicated on September 6th.   See Evidentiary Hr'g Tr. at 20-21.

2.     The Report & Recommendation (Doc. 39) is **ADOPTED in part** only as stated herein.

3.     Defendant's Motion to Suppress Historically Stored Data (Doc. 25) is **GRANTED in part** and **DENIED in part** as stated herein.

a.     The Motion to Suppress is **GRANTED** to the extent Defendant seeks suppression of data from September 1st through 5th and the 7th.

b.     The Motion to Suppress is **DENIED** to the extent that Defendant seeks suppression of data from September 6th.

**DONE AND ORDERED** in Jacksonville, Florida on June 15, 2020.

MARCIA MORALES HOWARD
United States District Judge

Lc23
Copies to:

Counsel of Record